1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF MISSISSIPPI

3
     UNITED STATES OF AMERICA,          )
4                                       )
               Plaintiff,               )        CASE NO. 1:15CR98
5                                       )
                  vs.                   )
6                                       )
     MUHAMMAD ODA DAKHLALLA,            )
7                                       )
               Defendant.               )
8    _____

9

10             SENTENCING AS TO COUNT 1 OF THE INDICTMENT
             BEFORE CHIEF DISTRICT JUDGE SHARION AYCOCK
11               WEDNESDAY, AUGUST 24, 2016; 11:30 A.M.
                        OXFORD, MISSISSIPPI
12
     FOR THE GOVERNMENT:
13
          United States Attorney's Office
14        CLAY JOYNER, ESQ.
          BOB NORMAN, ESQ.
15        900 Jefferson Avenue
          Oxford, Mississippi  38655-3608
16

17   FOR THE DEFENDANT:

18        Federal Public Defender's Office
          GREGORY SCOTT PARK, ESQ.
19        1200 Jefferson Avenue, Suite 100
          Oxford, Mississippi  38655
20

21
          Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23
                 RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
24                FEDERAL OFFICIAL COURT REPORTER
                911 JACKSON AVENUE EAST, SUITE 369
25                 OXFORD, MISSISSIPPI 38655

1      (CALL TO ORDER OF THE COURT)

2           THE COURT:  Good afternoon.

3           MR. JOYNER:  Good afternoon, Your Honor.

4           MR. NORMAN:  Afternoon.

5           THE COURT:  Okay.  You may call the case.

6           THE COURTROOM DEPUTY:  Court calls Case No. 1:15CR98,

7  United States of America v. Muhammad Oda Dakhlalla for

8  sentencing.

9           THE COURT:  Thank you.  I have Clay Joyner, Assistant

10  United States Attorney, represents the Government, along with

11  Bob Norman.  I also have present Rebecca Magnone.  And

12  representing the defendant, Greg Park.  And your probation

13  officer is Kimberlee Hatter.  She is in the courtroom.  I have

14  Mr. Thomason in the courtroom with the FBI as well too.  Thank

15  you.

16      Mr. Park, first, let me ask, while you're seated at

17  counsel table, do either of you desire to call any witnesses?

18           MR. PARK:  No, Your Honor.

19           MR. JOYNER:  None by the Government, Your Honor.

20           THE COURT:  Thank you.  Then, Mr. Park, would you

21  bring your client forward.

22      (PARTIES COMPLYING)

23           THE COURT:  Mr. Dakhlalla, on a previous occasion,

24  you entered a plea to Count 1 of the indictment.  And you're

25  here today for sentencing.  You understand?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And, so, between the date that you

3  entered your plea and today, a Presentence Report was prepared.

4  Have you had an opportunity to review the Presentence Report

5  with your attorney, Mr. Park?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Mr. Park, are there any objections to the

8  Presentence Report?

9          MR. PARK:  No, Your Honor.

10          THE COURT:  Any objections, Government?

11          MR. JOYNER:  No, Your Honor.

12          THE COURT:  So, Counselors, here's what I've received

13  and reviewed.  There are 23 letters that have been submitted on

14  Mr. Dakhlalla's behalf, and I have briefly looked at those.

15      Mr. Park, you submitted a sentencing memorandum; and I

16  have read that.  And, importantly, the Government has submitted

17  a 5K motion; and, of course, I've read that.

18      So, at this time, what I would like to do is hear from

19  you, sir, if there's anything that you would like to say prior

20  to sentencing.  And then I'll give the Government an

21  opportunity to speak and then, lastly, give Mr. Park, on your

22  behalf -- an opportunity to speak on your behalf.  Okay?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  You may proceed.

25          THE DEFENDANT:  First and foremost, I'd like to

1   acknowledge the charges that have been placed on me.  I do

2   accept that responsibility of sending those messages, and I

3   regretfully -- excuse me -- I regretfully wish that I never had

4   done it in the first place.

5        Secondly -- hang on a second.  I wanted to mention what my

6   mindset was before the arrest and after the arrest, Your Honor.

7             THE COURT:  Yes, sir.

8             THE DEFENDANT:  Before the arrest, our family wasn't

9   really much of a TV family.  We did have a TV; but we would use

10  it, you know, for movies and things like that.  We weren't

11  really watching the news or anything like that.  So a lot of my

12  information that I got was through the internet.

13       And, you know -- but the internet's a lot of, you know,

14  open source, you know.  Anybody can say whatever, really.  So

15  that's where I got a lot of my information from.  As far as

16  these videos that I'd seen before my arrest, you know, I had

17  thought, when I looked through these, that, you know -- I was

18  like, oh, you know, look , these look like good people.

19       And I referred to the ISIS and the people there.  You

20  know, I looked at these people are good, and they're helping

21  out people and even what looks like the Syrian citizens, you

22  know.  They're speaking highly of them like they're heroes or

23  something like that.

24       And, so, that was part of it in my head.  And another part

25  was kind of feeling in the depressed state, sort of powerless

1  in a way.  I couldn't feel like I could take, you know, the

2  responsibilities that I had at my home at that time.

3       And, after my arrest, you know, the time spent in jail,

4  you know, the TV was all available to me.  And, you know, I had

5  seen things on news, you know, all the violences that have been

6  caused in the Middle East, Europe, and even here on American

7  soil.

8       When I looked at that, I saw -- I was like, wait a minute;

9  this isn't what I saw from those videos, you know.  And, from

10  the Islamic perspective, I was like no; they couldn't have just

11  randomly decided to kill innocent people like this.  This isn't

12  allowed in Islam.

13       And then the next big alarm that shocked me even more was

14  the big news on the Syrian migration to Europe and the United

15  States.  And I thought to myself, wow, I've got this completely

16  mixed up.  I was completely wrong about what I have thought

17  about what ISIS was, you know.

18       You know, when I now come to the conclusion, you know,

19  they're really sick and twisted.  You know, they twist Islam

20  for their own agenda, own political agenda.  So that --

21  that's -- you know, now my mental state now, you know.  I

22  denounce them.  I condemn them.  You know, I don't appreciate

23  anything that they do at all.

24       My third point is that the day before my arrest I had

25  basically lied to my mother that I'd be going on vacation with

1    my ex and -- excuse me.  (Pause).  And it was the last time I

2    ever got to hold her.  Now that she's passed away, I regret

3    ever lying to her like that.  She didn't deserve it.  She was

4    always in full support of whatever I did.  I'm sorry, Your

5    Honor.

6          The fourth thing I -- I do realize, you know, throughout

7    the months being in jail, that the FBI -- they really saved my

8    life, Your Honor.  I was about to do something really reckless

9    and stupid and more than -- you know, even if I was successful

10   in getting over there, I'd have probably been dead by now, Your

11   Honor.

12         And, so, I personally want to thank the FBI, especially

13   Mr. Steve Thomason and his crew for taking me and arresting me.

14   Because they really did truly save my life.  I'm eternally

15   grateful for that.

16         And, lastly, I -- you know, now that I've seen, you know,

17   the biggest mistake of my life -- and I feel that I betrayed my

18   own country by committing this crime; and I wanted to really do

19   anything that I can to spread the message, educate people about

20   how twisted and savage this group of ISIS really is.

21         And I'm willing to speak in all sorts of media outlets

22   that I'm given the opportunity to, if possible, Your Honor.

23   Thank you for your patience and time, Your Honor.

24              THE COURT:  Thank you.

25         Mr. Joyner?

1          MR. JOYNER:  Your Honor, the Government has no doubt

2 as to Mr. Dakhlalla's sincerity in what he's saying to you

3 today; and that's why we filed the pleading with the Court that

4 we filed, and we stand by that motion.

5          That being said, however, I would like to point out, in

6 light of the fact that Your Honor referenced reading that

7 document, we do have a couple of disagreements with the

8 sentencing memorandum filed by the defense; and I'd like to

9 address three principle points related to that.

10          The memorandum in -- it plainly states that it

11 acknowledges that entrapment was not an actual issue in this

12 case; but then, pretty much in that same statement, it comes

13 close to implying overreach by the Government in the online

14 conversations with Mr. Dakhlalla and Ms. Young.

15          And I'd just like to point out, for the record, that that

16 was not the case.  The Government undercovers in those

17 conversations were generally reactive to questions and concerns

18 expressed by either Ms. Young or Mr. Dakhlalla.

19          Just a couple of brief examples, on the first two pages of

20 where quotes were given of what the undercover said, for

21 example, "I will have an niqab -- which, of course, is the

22 cloth to cover your face -- waiting for you upon your arrival.

23 It is best to travel without one."

24          That comes, essentially, directly after Jaelyn has

25 bemoaned not being able to bring a niqab because she views it

1  as being possibly suspicious.  The next page, July 8th, quotes

2  about, "Your stay in Istanbul will be short; and once you

3  arrive, you will not have to worry about expenses.  You are

4  welcome in our homes and at our table."

5       Again, that's in response to conversation pieces,

6  principally with Jaelyn, regarding the fact that they don't

7  have much money to travel on, etc.  Likewise, offering up

8  prayers for them, etc.

9       We have to keep in mind that the undercovers are

10  portraying a role as ISIS or ISIL members, and they have to

11  stay within that role.  So, of course, they're going to say

12  those kinds of things in response.  And my only point is, the

13  things that were said that were called into question, I think,

14  in the memorandum, those things are being responsive to things

15  that the defendants were asking about or expressing concern

16  about.

17       As far as the listing of the cases goes at the --

18  basically, the back index of this document, I understand, as

19  well as I know Mr. Park understands, that the Court's not going

20  to base any kind of sentence on a number of other examples that

21  we don't have proper context on; that we don't know all the

22  facts of.

23       I would point out just one thing in relation to that

24  listing of cases, and that is that Congress itself has

25  recognized the particular severity of this type of offense in

1  increasing the penalty on the material support charge from 15

2  to 20 years as of June 2nd of last year.

3      And, coupled with that fact, I stand by the statement made

4  just, I think, less than two weeks ago at Ms. Young's

5  sentencing, where low sentences are not the norm at all in

6  these cases.  They are outliers.

7      And, finally -- and probably my most lengthy points --

8  again, I understand what Mr. Dakhlalla is saying to the Court

9  here today.  I have no reason to doubt that he renounces this

10  group.  But I guess we're not here regarding what his feelings

11  are today; we're here regarding specific actions that he took.

12      And, in that memorandum, it's pointed out -- I think it's

13  pages 2 and 11, most principally, that in no communication did

14  Mr. Dakhlalla approve of harm against the United States or

15  agree to take up arms against it.  Technically true.

16      And then the statement he never asked to be in the

17  military nor expressed a desire to kill Americans.  I do take

18  issue with that comment about him never asking to be in the

19  military.  And I'd like to go through specifically what was

20  said in those conversations.

21      On June 5th, 2010, Mr. Dakhlalla stated to the undercover,

22  "I am good with computers, education, and media.  What could I

23  contribute to Dawlah?  In reference to the Islamic territory.

24  "In sha Allah," God willing.

25      And then the question, "Would we be appointed to a city,

1    or would we choose to go where we want to live when we arrive?"

2    That second question being basically a demonstration that he

3    knows he may be subjected to orders; that is, he is going to be

4    acting under the control of others.

5         There's, later, a response by the undercover employee

6    that, "For your contribution to Dawlah, akhi -- which means

7    brother -- it depends on your skills and training."  There's a

8    mention of air strikes reducing the number of fighters.

9         And he goes on to say, "If you are strong and in shape,

10   akhi and Allah swt -- which means, basically, glory to Him, the

11   Exalted -- has chosen your path to fight fisabilillah (for the

12   sake of Allah), you'll be sent to training when you safely

13   arrive in Dawlah, in sha Allah."  Which, once again, means God

14   willing.

15        Okay.  I think this is important to note, the next lines

16   of that is the undercover agent, operative, whatever you want

17   to call him, employee, giving Mr. Dakhlalla an out at that

18   point.  He goes on to say, "You say you have computer and media

19   skills.  This is so important to the growth of the khilafah and

20   just as noble as being a mujahidin.  Because it spreads the

21   message of khalifah Ibrahim and helps other brothers and

22   sisters with hijrah travel" to Islamic State in Allah's name.

23   In sha Allah."  If God's willing.

24        Once you're in Dawlah, this will be decided; but, if you

25   have computer for video editing media, bring it with you,"

 1  basically.  So it's pointed out that's just as important, being

 2  in the media, being involved in their media group efforts,

 3  that's just as valid to them as being involved in the military

 4  aspect.

 5       Then, on June 10th, 2015, Mr. Dakhlalla asked "Ya akhi --

 6  which is brother -- could you tell me of what I would have to

 7  do once I make it to Dawlah?  In sha Allah, go through training

 8  and Shariah first?"

 9       And then there's a number of responses regarding sharia,

10  principally.  And that's followed by, on July the 12th, 2015,

11  Mr. Dakhlalla says "I wanted to ask about the military

12  experience there.  Would I be with people that speak English as

13  well, or do they put me with everyone else at basic training."

14       That's not being suggested to him by the undercover

15  employee; that's a statement from Mr. Dakhlalla.  The

16  undercover employee points out to him -- now, he's in no way

17  discouraging him.  He points out to him "Many brothers come to

18  training and are not able to fight, and commanders do not want

19  brothers that are not lions or have a weak heart in battle.

20  You must be committed if you are to become mujahidin, akhi."

21       And, so, it's suggested in the body of the memorandum that

22  that statement is essentially what Mr. Dakhlalla then turns

23  around and parrots back to who he's talking to saying "I wish

24  to be a mujahidin; I'm willing to fight.  I want to be taught

25  what it really means to have that heart in battle."

1        Which is, of course, a quote that we've all heard in this

2   case.  But what's important is, between what that undercover

3   says along the lines of, you know, they're not lions or have a

4   weak heart in battle, there's another statement in there.  And

5   it's yet another out provided to Mr. Dakhlalla.

6        So the -- again, the undercover says, "Many brothers come

7   to training; they're not able to fight.  Commanders don't want

8   brothers that are not lions or have a weak heart in battle.

9   You must be committed if you're to become a mujahidin, akhi."

10       Next statement by the undercover employee, "Akhi, I don't

11  make the decisions; but this will be decided once you arrive.

12  Do you want to be a mujahidin and fight for Dawlah and for

13  Allah?  If so, the brothers will teach you everything you need

14  to know.  If you just want to do media, you will let them know

15  when you arrive.  But you should have an idea before you get

16  there, in sha Allah."

17       And the response to that is, from Mr. Dakhlalla, "I wish

18  to be a mujahidin, akhi.  I'm willing to fight.  I want to be

19  taught what it really means to have that heart in battle."

20  And, again, I point that out just because I felt like, in the

21  body of that motion -- or the memorandum, rather, it's -- went

22  a little bit too far in trying to minimize what the actual plan

23  and idea was at the time the conduct was taking place and not

24  here a year later in hindsight.

25       And I understand that Mr. Dakhlalla was sheltered, didn't

1  necessarily have a television in the home, that kind of thing.

2  But to say that he doesn't know -- didn't know at the time what

3  ISIS was all about, that they were just there to help people --

4  I know some of the videos that he watched -- or at least one

5  that he watched with Jaelyn was of men who were accused of

6  homosexuality being taken up to rooftops in Raqqa and thrown 7

7  or 8 stories down to concrete below.

8          And the way those things end is, if the person doesn't die

9  from the fall, there's a crowd standing around below at the

10  bottom waiting to stone them if necessary. And this group

11  that's supposed to be so helpful to the planet -- you know,

12  they saw that video. And it's not as if ISIS or ISIL is hiding

13  who they are.

14          Keep in mind that Mr. Dakhlalla and Ms. Young tried to

15  board the plane on August the 8th of last year. Beginning on

16  August 19th of 2014, ISIL began to engage in a series of the

17  most horrific and most public possible crimes.

18          It started on that date with the beheading of Jim Foley, a

19  well-known war reporter. He wrote of many people. He was

20  beheaded, principally, for the crime of being an American.

21  That was followed shortly thereafter, a couple of weeks later,

22  by the beheading of Steven Sotloff, an American-Israeli, dual

23  citizen, I believe.

24          On January the 3rd, 2015, Muath Al-Kasasbeh, who was a

25  Jordanian pilot -- I think we all recall that incident, where

1  he was burned alive in a cage.  Shortly thereafter, Kenji Goto,

2  a Japanese reporter, was beheaded.  I apologize I left out, on

3  September the 13th of 2014, David Haines, a British aid worker,

4  was likewise beheaded.

5      The reason I point those out -- Mr. Dakhlalla bears no

6  responsibility for that; other people did that.  I'm not trying

7  to tie him to those specific crimes at all.  What I'm saying

8  is, there is no one on the planet, who was not living under a

9  rock, who was not aware, at the time that Mr. Dakhlalla and

10  Ms. Young were actually researching ISIL-related matters in --

11  pretty much throughout the entire spring of 2015.

12      There's nobody not living under a rock that did not know

13  what ISIL was doing.  ISIL was not trying to hide what they

14  were doing.  They were videotaping the beheadings specifically

15  to put on the internet and show people what they were doing.

16  They videotaped the burning alive of that pilot to put on the

17  internet and show people what they were doing.

18      *Dabiq* magazine, their online platform, is clear about what

19  they're doing.  They are proud of what they're doing.  And, so,

20  to say that you're not aware of their atrocities is a bit

21  disingenuous.  And that's -- that's my only problem with

22  anything that's been said here today.

23      I fully believe -- well, let me just say this, the

24  predicate crime that he's being sentenced for is the exact same

25  crime that Jaelyn Young committed, that is, they were getting

1  on an airplane to fly to Turkey.  To me -- and there's been all

2  this talk about, well, it was an ill-planned adventure.  But

3  not really.

4       Money had been paid to expedite passports.  Tickets were

5  purchased.  Coordination was made -- and I will say this --

6  principally by Ms. Young.  Most of that planning was by her.

7  Mr. Dakhlalla did pay to have the passports expedited, but

8  Ms. Young did plan it; but that planning included pretty

9  specific planning.

10      They were going to meet at the blue mosque in Istanbul.

11 Their clothing had been described.  They fully expected to meet

12 an ISIL operative there.  No question about that.  It's the

13 exact same crime she committed.

14      While saying that, the Government absolutely agrees with

15 counsel opposite that Muhammad Dakhlalla is not as culpable as

16 Jaelyn Young in this matter.  The reason we filed the pleading

17 that we filed is because we believe that.  His sentence should

18 be somewhat less than Jaelyn Young's, we believe.

19      However, it's also the Government's position that the

20 appropriate sentence in this case remains one that recognizes

21 the utter severity of the crime in question.  I understand that

22 he is a first offender, but he has offended for the first time

23 in a fairly spectacular fashion.

24      And the Government would ask that the sentence, Your

25 Honor, recognize the need to deter others from such conduct.

 1   Thank you, Your Honor.

 2            THE COURT:  Thank you.

 3       Mr. Park?

 4            MR. PARK:  Thank you, Your Honor.  We filed a lengthy

 5   sentencing memorandum to address numerous issues in regard to

 6   Mr. Dakhlalla.  And I would start by saying that the

 7   Presentence Report prepared by Ms. Hatter does an excellent job

 8   of laying out the facts of the case in pretty specific detail.

 9       In my memorandum, I went back; and I added the quotes that

10   were exchanged between federal agents and Ms. Young and

11   Mr. Dakhlalla to give the Court context about how all of this

12   came about.  And I didn't intend to mention these; but, given

13   Mr. Joyner's comments, I think there's a need to address some

14   of those.

15       Now, the first one that he mentioned in regard to

16   Ms. Young that there were -- they were reactive in certain

17   circumstances, to comments that she made.  And we take no issue

18   with that; and, in fact, specifically stated, in our

19   memorandum, that these were quotes from agents to Ms. Young.

20       There's certainly -- there's a greater depth to those

21   comments.  We did not intend to go into those.  But, in those,

22   the agents are basically agreeing to do what I stated at the

23   beginning of the memorandum, which is to take away all relevant

24   obstacles to their travel.

25       In essence, repeatedly offering to help with travel

1 supplies, repeatedly offering prayers for both of them.

2 Indicating when they should purchase their tickets. Offering

3 to help with every step of the way.

4     Making comments -- and these may be the reactive points

5 that Mr. Joyner was referring to, about -- about gay people and

6 about lies about sex slaves being part of ISIS, about how there

7 would be no expenses for them, about how they would be provided

8 with lodging and shelter.

9     All of these comments that were made to Ms. Young were

10 geared for a specific purpose. And we specifically did not

11 argue that this was entrapment. But we certainly did offer

12 those quotes for exactly what they are. Your Honor's had a

13 chance to read them. And those are quotes, Your Honor. Those

14 are not excerpts.

15     In contrast -- and I know Mr. Joyner did not make the same

16 comment in regard to Mr. Dakhlalla's exchanges with the agents,

17 but I went into the detail that was provided specifically in

18 regard to the exchanges between Mr. Dakhlalla and the agents

19 because I wanted the Court to see both sides of that

20 conversation.

21     And those conversations are specific. They address Mr.

22 Joyner's point about the military training when Mr. Dakhlalla

23 expresses curiosity as to what he might face if he were to

24 travel. The agents told him, on June the 5th, that he would go

25 through training if he was sufficiently fit.

1    Mr. Dakhlalla, from that point forward, assumed that

2  military training would be something that would apply to him,

3  whether he worked in computers or media or anything else.  He

4  understood or believed that there would be training involved.

5    Also, in regard to Mr. Joyner's comments about the

6  beheadings and the aspects of ISIS that he described,

7  Mr. Dakhlalla understood and it was -- it was an understanding

8  by him that there were radicals within ISIS.  He was led to

9  believe that not all of them are radical.

10    And I quoted from the *New York Times* article about how the

11  propaganda that's put out by ISIS is specifically geared --

12  these things are professionally made videos showing the good

13  that they do in communities, or at least that's what the

14  propaganda insists.  And there are radicals in every religion,

15  Christianity included.

16    It was his assumption that those people who were beheading

17  people or throwing a homosexual person off of a building were

18  the radicals and not the norm.  And Mr. Joyner addressed it as

19  a technical point that I raised, but it's an absolute fact;

20  that Mr. Dakhlalla never agreed to take up arms against the

21  United States or its allies.

22    He was led to believe that the struggle of ISIS was for

23  Islam itself; and that a weak Muslim is one who would not

24  defend his religion.  When he watched some of these videos and

25  they were inspirational in nature, that's where -- that's one

1 of the things that led to that comment about learning to fight

2 with the heart in battle.

3     That's something that Mr. Dakhlalla thought was absent

4 within himself. As you can see from the context of the other

5 factual details in that sentencing memorandum and in the

6 letters of support, you knew -- or have a good idea of the

7 mental and emotional condition that he was under at the time.

8     Those are very specific circumstances, but they certainly

9 paint the picture of how Mr. Dakhlalla got into the position of

10 being willing to purchase a ticket and travel to the Middle

11 East.

12     I would note, in the sentencing memorandum, in terms of

13 painting that picture of Mr. Dakhlalla, you're talking about

14 somebody who graduated high school with a 4.0 GPA. He

15 graduated cum laude with a bachelor's of science degree in

16 psychology from Mississippi State University and was accepted

17 into a master's program.

18     You see the details of his efforts to raise money for

19 charities, including cancer, which eventually took his mother

20 in April of this year. You see him building houses for Habitat

21 For Humanity. You see what he has done every day of his life

22 up until he purchased that ticket to ride aboard that plane.

23     And those are not the actions of a terrorist. And trying

24 to draw an analogy between the peaceful life that he's led as a

25 Muslim is in stark contrast to what Mr. Joyner's describing.

1    You also received a letter that is referenced in the sentencing

2    memorandum from an openly gay individual in Mississippi who

3    spoke of Mr. Dakhlalla as a Muslim coming to his defense and

4    standing up for him.  Those are not the actions of the

5    individual described by Mr. Joyner.  So we're asking the Court

6    to take a look at Mr. Dakhlalla in the proper context in

7    determining an appropriate sentence.

8         In providing the list of current prosecutions and cases

9    that are pending, we did our best to cull all of the cases that

10   are active in the United States and most of them remain pending

11   for sentencing.  The purpose of providing that was to give Your

12   Honor a little idea of the extremes.  You've got some people

13   who are willing to pick up bombs and use them on U.S. soil.

14   That's on one side of the spectrum.

15        On the other side of the spectrum is Mr. Dakhlalla.  And I

16   would compare his case to the least culpable of any prosecution

17   currently pending or that's been resolved; and he is at least

18   as less culpable as anyone, if not the least culpable of them

19   all.

20        You're seeing the letters of support that were submitted

21   on his behalf.  They talk about his gentle nature, his

22   sacrifices to help out other people, thinking of himself second

23   as compared to any other individual.  And those are some

24   powerful letters that are submitted on his behalf.

25        Your Honor, we've also mentioned, at the conclusion of the

1   memorandum, that -- we're requesting that the Court consider a

2   downward departure based on aberrant behavior under 5K2.20 of

3   the Federal Sentencing Guidelines.  We believe that

4   Mr. Dakhlalla's conduct fits squarely within those principles.

5        The first one is the -- whether the offense involves

6   significant planning.  And I went to length in the memorandum

7   to point out the lack of planning in this offense.  And I made

8   an analogy basically stating that college students put greater

9   planning into spring break vacations and attending out of state

10  football games than Mr. Dakhlalla and Ms. Young put into this

11  offense.

12       They were planning to board a plane and fly to the Middle

13  East.  They didn't have a single telephone number to call.

14  They didn't know the name of anyone.  They didn't have lodging.

15  They didn't have plans for food.  They had next to zero money.

16  They had no idea what they would do for transportation.

17       The planning was minimal at best.  The duration of this

18  offense was very limited.  They obtained passports and bought a

19  plane ticket.  That's not much of an effort.  Now, I realize

20  that there was research that had been going on; and I'll

21  address that in a minute.  But, again, the duration is very

22  short.

23       And, finally, the concern is whether or not this offense

24  represents a marked deviation from the otherwise law-abiding

25  life led by Mr. Dakhlalla; and it absolutely does.  The

1   commentary to that guideline requests that the Court consider

2   other aspects, such as his mental and emotional condition at

3   the time; and we've addressed that.

4        And another factor is what efforts he has taken to rectify

5   the situation or mitigate the damage, and he did that the

6   moment that he was arrested.  He has been completely truthful

7   and honest about his actions in this cause.

8        He has certainly represented that he is willing to take

9   whatever efforts are necessary to keep other individuals from

10  being recruited by ISIS.  And he's very sincere about those

11  statements.

12       Your Honor, in determining an appropriate sentence --

13  Mr. Dakhlalla acknowledges that this is a serious crime.  As

14  you know, he has no criminal history.  But the guidelines call

15  for an automatic placement in Category 6 for his criminal

16  history.  The reality is that he's led a law-abiding life other

17  than this act.

18       Your Honor, I've been appearing in your court for many

19  years; and you know the kind of representations that I make on

20  behalf of defendants just about every day or every week in your

21  court.  And you've never seen me stick my neck out for somebody

22  before, other than one time.  And, when you placed trust in

23  that individual, they came through.

24       And what I'm representing to the Court is that, if you

25  take a chance on Mr. Dakhlalla and impose the lowest sentence

1  that you deem appropriate, he will not let this court, his

2  family, his friends, or himself down.  Thank you, Your Honor.

3        THE COURT:  I'll start by mentioning that in this

4  case, under the plea agreement, there was an 11(c)(1)(C)

5  agreement where the parties agree to a sentence of not more

6  than 12 years, 144 months being an appropriate disposition in

7  the case.  So the Court has considered the reasonableness of

8  allowing the 11(c)(1)(C) to be adopted, merely meaning that the

9  sentence would not be more than 12 years.

10      The Court understands, and has considered, the fact that,

11  under the guidelines, Mr. Dakhlalla's guideline sentence would

12  be 292 to 365 months, essentially life.  And, under the

13  statute, he is -- has a mandatory maximum of 20 years.

14      So the real -- the real comparison here is the 240 months

15  compared to 144 months, and is it reasonable to say that the

16  top end of his sentencing should be that of 144 months as

17  agreed to by the parties.

18      I'm going to accept the plea agreement.  I do so for a

19  number of reasons.  First of all, I'm appreciative of the fact

20  that the attorneys in this case understand this case and know

21  the details of this case better than the Court, and always do

22  on any occasion.

23      Secondly, I think it is important to acknowledge that

24  there are some mitigating factors in this case; and those have

25  been taken into consideration, I'm sure, by the Government in

1    agreeing to a limit of 144 months.

2         Mr. Dakhlalla, I think probably the saddest thing out of

3    this -- and there are many, many issues that could be

4    discussed, not to mention your family, your friends, and those

5    that you indicate that you have let down.

6         But it's -- it's real disappointing that -- you're so

7    intelligent and bright and graduated first in your high school

8    class and with honors from Mississippi State and have siblings

9    that obviously, from the report, have done extremely well.

10        And I'm sure -- I'm certain, based on your intelligence,

11   that but for this despicable crime that you committed there's

12   no telling what the limits could have been for you.  So that's

13   sad that you've lost that.

14        I do appreciate the fact that you acknowledge that the FBI

15   saved you.  Because, in all probability, they did.  They

16   probably saved your life.  So, you know, all of these things

17   have to be taken into consideration in some balance of what is

18   the appropriate sentence in a case.

19        But I think it's reasonable for these parties to have

20   agreed that 144 is the maximum that it should be in light of

21   the many factors here of mitigation.  So having said that --

22   and I should say, as part of that, the acknowledgment that you

23   have no criminal history.  Mr. Park points that out.

24        But, you know, it's not -- it's probably more rare than it

25   is common that we deal with federal inmates, federal prisoners,

1  that have no criminal history.  And you have no criminal

2  history.

3       So we'll start with that premise, that the Court adopts

4  the plea agreement and accepts 144 months to be the maximum to

5  be imposed.  Now, Mr. Park's done an excellent job of preparing

6  a sentencing memorandum; and Mr. Joyner has pointed out the

7  things that he takes issues with about that sentencing

8  memorandum.

9       So, again, we're looking at should there be some sentence

10  less than 144 months in light of the 5K2.2 factors and the 5K1.

11  The 5K1 being a motion for substantial assistance.  I've read

12  the 5K1.  And, without going into the details of it, I adopt

13  it.  I believe you are entitled to some reduction in the

14  sentence off of 144 months because I am comfortable that you

15  have -- I am comfortable that the Government makes an accurate

16  representation in their motion.

17       That being said, the crime itself has got to be addressed.

18  And, Mr. Park, I do appreciate that you obviously, from the

19  heart, believe that we will not see this young man again in our

20  Court; and I trust that we will not.  So, you still have some

21  opportunities ahead of you; but we must address punishment for

22  the crime that you admittedly committed against the United

23  States.

24       The Court adopts the Presentence Investigation Report

25  without change.  No count of conviction carries a mandatory

1 minimum sentence. The total offense level under the guidelines

2 is 35, Criminal History Category 6 because of the facts of this

3 case.

4      Guideline range, as I've mentioned, is capped at

5 244 months because of the statutory max. The supervised

6 release is not more than life; and fine range under the

7 guidelines is 20,000 up to 200,000. Under the guidelines, a

8 fine would be waived because of your inability to pay.

9      The Court is going to impose a sentence outside the

10 sentencing guidelines, a variance to the guidelines. And I'm

11 doing so because there is a binding plea agreement for a

12 variance accepted by the Court, the 144 months. This is below

13 the guideline range.

14      And I'm doing so because of these factors that have been

15 considered, among many others, I might add, in considering what

16 would be the appropriate sentence, the history and

17 characteristics of the defendant pursuant to 18 U.S.C. Section

18 3553(a)(1), which includes your age. The Court takes into

19 consideration your youth and your -- I might say immaturity in

20 this matter.

21      The Court also wants you to understand the seriousness of

22 the offense, and that any sentence imposed would hopefully

23 promote respect for the law and provide just punishment, to

24 afford adequate deterrence to criminal conduct, and to protect

25 to the public from further crimes of the defendant.

1     And that's very important.  I can't disagree with Mr. Park

2  that, probably, I won't see you again; but these are serious,

3  serious crimes against the United States.  Restitution does not

4  apply in this case.

5     In imposing sentence, the Court has considered the

6  advisory guideline range, the statutory penalties, and the

7  sentencing factors enumerated in 18 U.S.C. Section 3553(a).

8  The Court finds that a sentence outside the advisory guideline

9  range is appropriate pursuant to 18 U.S.C. Section 3553(a), and

10  that it better achieves the statutory purposes of sentencing.

11     Pursuant to the Sentencing Reform Act of 1984, it is the

12  judgment of this Court, Mr. Dakhlalla, that you be committed to

13  the Bureau of Prisons to be imprisoned for a term of 96 months

14  on Count 1 of the indictment.  For purposes of the math, that

15  is an approximately one-third reduction of your capped sentence

16  at 144 months.

17     Upon release from imprisonment, the defendant shall be

18  placed on supervised release for a term of 15 years.  For

19  15 years, you'll be on supervised release.  Now, during that

20  period, there will be two mandatory conditions.  One is that

21  you shall not possess a firearm, destructive device, or any

22  other dangerous weapon.  And, secondly, you shall cooperate in

23  the collection of DNA as directed by your probation officer.

24     Mr. Dakhlalla, there are a number of what we call standard

25  conditions, conditions that will be explained to you by your

1  probation officer when you are released from the Bureau of

2  Prisons.  I'm not going to go over all of those with you here

3  today.  But I am going to tell you that it's -- they're

4  enforceable just as if they were incorporated in -- in this

5  oral pronouncement.

6       There are some special conditions, and I want to read

7  these to you to make certain that you understand these

8  conditions.  You shall participate in a program of testing and

9  treatment for substance abuse as directed by your probation

10 officer.

11      To be very candid with you, I don't see that being a

12 problem given your history; but, as a precaution, it is

13 included in this judgment.  It can be dispensed with by your

14 probation officer if they do not see a need.

15      You will be required to submit to periodic, unannounced

16 examinations of your computer system for your computer or

17 computer-related devices.  I might say the internet's what got

18 you into trouble and -- since.  And, so, yes, you will be

19 monitored for 15 years on your computer use.

20      This may include retrieval and copying of all memory for

21 hardware, software, and/or removal of such system for the

22 purpose of conducting a more thorough examination.  You may be

23 required to have installed on the computer any hardware,

24 software to monitor your computer use or to prevent access to

25 particular materials.

1      You shall provide the probation officer with accurate

2 information regarding your computer system and computer-related

3 devices.  That includes all passwords that are used by you.

4 That includes name and address of your internet service

5 provider.  And, of course, you'll be expected to comply with

6 all the rules that the probation officer outlines for you

7 regarding your computer use.

8      No fine is being ordered in this case.  However, it is

9 ordered that if you have not already paid the $100 special

10 assessment to the District Court Clerk's Office, then that is

11 due immediately.

12      Now, contained in that plea agreement, Mr. Dakhlalla, was

13 a provision of an 11(c)(1)(C), which we have addressed of

14 144 months and any reduction from that that I've given you.

15 What also was provided for in that plea agreement was a waiver

16 of your appeal rights.  And you remember that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Well, I'm going to read it to you.  You

19 expressly waived any and all rights to appeal the conviction or

20 the sentence imposed in this case and the manner in which the

21 sentence was imposed on any ground whatsoever, including, but

22 not limited to, the grounds set forth in 18 U.S.C. Section

23 3742, except for two situations where you may still appeal,

24 ineffective assistance of counsel or prosecutorial misconduct.

25          So the -- you also waived all rights to contest or

1   collaterally attack the conviction or the sentence or the

2   manner in which the sentence was imposed in any postconviction

3   proceeding, including, but not limited to, any actions brought

4   under 2255, except for those two exceptions.  Do you understand

5   that waiver?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  And acknowledge that you agree to that as

8   part of the plea agreement if the Court accepted the 5K1?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  So are there any counts to be dismissed,

11  Mr. Joyner?

12          MR. JOYNER:  Your Honor, at this time, the Government

13  would move ore tenus that Count 3 of the indictment be

14  dismissed as to this defendant.

15          THE COURT:  It shall be dismissed.

16      Mr. Park, any other matters that I need to address that I

17  have failed to mention?

18          MR. PARK:  No, Your Honor.

19          THE COURT:  Mr. Dakhlalla, you'll be remanded to the

20  custody of the United States Marshals Service until you're

21  transported to a suitable facility.

22      Counselors, thank you.

23          MR. PARK:  Thank you, Your Honor.

24              (THE HEARING ENDED AT 1:15 p.m.)

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Rita Davis Young, Federal Official Realtime

5   Court Reporter, in and for the United States District Court for

6   the Northern District of Mississippi, do hereby certify that

7   pursuant to Section 753, Title 28, United States Code that the

8   foregoing is a true and correct transcript of the

9   stenographically reported proceedings held in the

10  above-entitled matter; and that the transcript page format is

11  in conformance with the regulations of the Judicial Conference

12  of the United States.

13

14

15              Dated this 26th day of September, 2016.

16

17

18

19              /s/ Rita Davis Young
                RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
20              Federal Official Court Reporter

21

22

23

24

25